Case number 21-1010, Northern Iowa, who's Buljic et al. v. Tyson Foods et al. And 21-1012, Northern Iowa, Oscar Fernandez et al. v. Tyson Foods et al. Mr. Clement, I think you're first, and I will tell you all that on your timing, you are all on the honor system, because for some reason, I can't see the timer on my screen. So I will trust your judgment and your watching of your own clock. And with that said, we'll start with you, Mr. Clement. Thank you, Your Honors, Paul Clement, for the removing defendants, and I'm gonna endeavor to save five minutes for rebuttal, and I'll watch the clock. In March and April of last year, the nation faced an unprecedented health crisis that threatened the nation's food supply as a panicked nation stockpiled food and left shelves bare. Thus, at the same time that federal officials encouraged most employers to close their physical workspaces and most employees to stay home, those same officials told food suppliers and workers that they had a special responsibility to keep working so that Americans would have access to food and panic stockpiling would cease. In the pandemic's early days, much about the virus and how it spread was unclear, but one thing was clear. Federal officials wanted major food suppliers to err on the side of keeping their facilities open and operating. Even during normal times, meat processing facilities operate under unusual degree of federal supervision and control. Almost unique among industries, they cannot operate unless a federal inspector is physically present on the premises. Even so, during normal times, Tyson has not sought to remove tort cases to federal court under a federal officer removal theory. But the dynamic in the pandemic was fundamentally different. Plants still operated under close federal supervision, but the federal government was not just regulating operations, but affirmatively encouraging them to continue and ensuring that healthy federal inspectors were available to keep the plants running. Under those circumstances, adjudicating a state tort suit premised on the notion that Tyson should have closed its doors earlier is fundamentally unfair. A state court jury considering only local concerns and ordinary duties of care under state law would wonder why Tyson did not shut its operations like other businesses. The answer- Just a moment. You've used words like encouragement and responsibility and should stay open. That doesn't sound like the same thing as being under the direction of a federal officer to assist the government in doing something that it should otherwise be responsible to take care of. Well, Your Honor, I'm trying to use my words carefully because I think they capture the dynamic at the time, which is Tyson was not operating at all times under a direct federal mandate that you must stay open. But at the same time, they were being affirmatively encouraged and cooperating with federal officials in order to stay operational and stay open. And I think that is sufficient under the case law to have the operations come under the authority and direction of the federal officials. I think- Do you think that's enough under Watson? I do think it's enough under Watson. And I think Watson is fundamentally distinguishable for the basic reason that Watson is your typical case of ordinary regulation. In a case like Watson, the federal government doesn't particularly want there to be or have an imperative for there to be light cigarettes on drugstore shelves. So they're just regulating in the ordinary course something that they'd be perfectly happy for the tobacco manufacturers to stop. It's a different dynamic when they're affirmatively enlisting the companies to continue operating and continue to supply the food for the shelves. And I think that's what really distinguishes the cases like Watson, which are regulation cases, and cases like this case, cases like the federal contractor cases, cases where if you go all the way back to the prohibition era cases, where the chauffeur for the federal prohibition officers are protected by federal officer removal. As far as I know, the chauffeur in those cases is not absolutely mandated to do that. The chauffeur probably wants to do that because it's part of his or her normal business operations. But the point is they're asked by the federal government, can you drive us to the scene of this bust that we're gonna do? They, in fact, do what the federal government asked them to do. They drive the federal officers there, and then they're sued in state court along with the federal officers in that case for undertaking- But isn't that the difference? You've just said that that chauffeur was directly asked to do something specific, which was to drive the federal officer. What was Tyson directly asked by the federal government to do? Not just encourage, but really asked to expressly do? To stay operational if at all possible. They were told- So you're describing that as a directive? Absolutely, Your Honor. And it's more than just a directive. It's a directive. We're told at the same time that others are being told you should stay home or you should shut your doors. We're being told we have a special responsibility to maintain our operations. But it doesn't end there. I mean, the very next day, we're told about the special responsibility in conjunction with the declaration of the national emergency on March 13th. Then the very next day, we're in communications with DHS about how we get the proper PPE and the proper materials in order to stay operational. That's a fundamentally different situation from normal regulation because normally, Tyson is not communicating with DHS. They might be communicating with the agriculture department, but not with DHS. But of course, it doesn't stop there because this industry almost uniquely has this additional issue, which is they can't operate unless the federal inspectors are on the premises. So they have to get the federal inspectors there. There have to be enough of them. The federal inspectors are as worried about getting COVID as the next person. So there are concerns about how are we gonna get enough federal inspectors so we can maintain our operations. We're also affirmatively concerned that the federal inspectors themselves could be carrying COVID and could be part of the problem. So there are back and forth about all of those issues. I think if you look at- Because the federal inspectors are there all the time anyway, right? You're just talking about additional inspectors. Right, but the thing is, the inspectors are there anyways, but under normal circumstances, there's not a federal imperative that there be enough inspectors to maintain operations. That's something that happens in the normal course, of course, but that's kind of more ordinary regulation. What I'm- Mr. Coleman, let me ask this in just a slightly different way. In order to be in a position of delegation rather than mere regulation, doesn't the federal government have to have delegated duties to Tyson beyond its normal operations? Well, I don't actually think so, Your Honor, which is to say, I'm not so sure that the chauffeur in the classic prohibition cases was doing anything beyond what he normally did, presumably drove for a living. It just happened to be under those circumstances, the federal government wanted them to drive their agents to the scene of the bust. But I do think that even if that's a requirement, that's met here. Because in an ordinary footing, you know, the federal government, obviously given the quantity of food that Tyson's produces, even under ordinary circumstances, it would be a problem for the federal government if Tyson stopped providing food. But the normal footing is just of a regulator and a regulated industry. But that really changed as soon as the Declaration of National Emergency took place on March 13th. And it changed for a very good reason. I mean, those food stores with the empty shelves were a real problem for the federal government. And it was important for them to ensure not just that there was a food supply, but that consumers had essentially a reassurance that the food supply was gonna continue. So they didn't have to next time they go to the grocery store, buy everything they could find and stockpile it. And the way that they did that was by ensuring that, announcing both to us and to the public more generally, that the food supply would be protected, it would continue as critical infrastructure. And then again, it wasn't just, you know, you have a special responsibility and then that's the last we heard. It's the very next day we're in communication with officials at the federal government, including some that we're not normally in communications with, about how are we gonna be able to stay open? How are we gonna be able, not just to get the materials for our workers that we need to stay open, but how are we going to get the federal inspectors there? How are we gonna deal with the federal inspectors? If you look at A-182 in the joint appendix, I mean, you'll see this extraordinary document where the agriculture department is telling us and other food manufacturers what questions we can ask of the federal inspectors about their own medical conditions to ensure that when they come on our facilities to keep us operational, they're not gonna be a source of the disease. All of that- In that same timeframe, there was also the memo from DHS, I think like March 19th, basically saying, we're here to support the locals, the state and the locals who have the primary responsibility, but we're the supporting role. This is not a directive. Here's our memo. And that was what? Just six days after, less than a week after the March 13th moment. Well, your honor, there is that reference. And look, in the early days of the pandemic, I think there was a little bit of dissonance on the part of the federal government as to how much they wanted to own the response and how much they were trying to defer to local officials. But there's no question that in the communications we're getting from the federal government from the beginning and consistently, that the federal government wants us to stay operational. And you see that culminate in obviously the executive order of April 28th. And that executive order is very specific that part of the reason that the government, the federal government finally got around to formalizing it is precisely because state and local policies were interfering with the ability of some food manufacturers to stay open. So, and then that's followed up with the May 5th statement from the secretary of the agriculture, who very specifically says that plants have an obligation to stay open, notwithstanding state and local law, at the point that they can comply with the CDC OSHA guidance that's issued for the first time on April 23rd. But even before, and this is where I think it really is important to put your mindset back to the very early days of the pandemic, where we're trying to deal with a completely unprecedented situation, but we're told we have a special responsibility to maintain our operations. We're coordinating with those federal officials to get PPE, to get a priority, to get those materials. And yet this state tortsuit would basically hold us liable for remaining operational at that time. And if you look at the allegations of this suit, they're saying we were grossly negligent for not testing our employees for COVID and providing for contact tracing back in March and April of 2021. Nobody was doing that back then. Nobody had the capacity to do that. So if that state tort regime is translated into a requirement, that's a requirement that we shut down our operations. And that's entirely antithetical to what the federal government was telling us they wanted us to do. That's entirely antithetical to our special responsibility. And then- Before we run out of time, I'd like to switch to another very important element of federal officer removal, and that's the colorable federal defense. Could you tell us how the Federal Meat Inspection Act provides a colorable federal defense to Tyson? Sure, Your Honor, I'd be happy to, because I do think that is the clearest example of a colorable federal offense. A colorable federal defense. That statute is broadly written that does not allow requirements inconsistent with federal law. Indeed, we supplied a 28-J letter yesterday with the District Court of Texas that found the equivalent defense under the PPIA, but the court said it was textually the same and has the same scope, found that defense not just colorable, but meritorious. And I think the reason is that the kind of requirements that the Agriculture Department has traditionally imposed are requirements that go to things like infectious disease, that go to hand washing. And the principle response on the other side is, well, but the government's principle concern is the safety of the meat, not the safety of the workers. But those aren't things that are just, you can separate like that. That's not some neat dichotomy. And you see that from the very provisions that we point to in our briefs in the service of trying to protect the quality of the meat and the safety of the meat. There are hand washing requirements, there are protective clothing requirements. And indeed, there are requirements that individuals who have infectious disease not go to the workplace in order to protect the meat. And for a state to impose the same kind of requirements, even if they're principally concerned about worker safety and not meat safety, that still raises the same kind of preemption issues. And I think that's a meritorious defense, as did the judge in Texas, but it sure is a colorable defense. And this is all novel and complicated enough that it seems only fair to somebody that remained operational at the behest of the federal government to have all of this sorted out in federal court. I think these issues are novel, they're difficult, but the alternative is to go to state court where a state jury is just gonna be instructed, did Tysons use the proper duty of care in remaining operational in the course of a pandemic? I don't think you can answer that question fairly without understanding that the federal government was not indifferent to any of this. The federal government was saying, no, you need to keep supplying this, you need to help us fill those shelves and you need to help us reassure the American public that those shelves will be full because you will remain operational. And I think that's really the missing piece here is this case, if it proceeds under state law as an ordinary state court case, is gonna really, I mean, the jury's only gonna hear half a loaf. It's not gonna hear all of the issues about what the federal government did and whether the net total of what the federal government told us to do amounts to a complete defense, the way that the district court judge in Texas came up with the conclusion, or it amounts to a series of jury instructions that a jury should hear. I think all of that, we're gonna get a much fairer shake if we get that in federal court. If I could save the remainder of my time for rebuttal, that would be my preference. You may. Mr. Pulver, are you going first? Yes, I am, Your Honor. Good afternoon, Your Honor. You may proceed. Thank you. Good afternoon. May it please the court, Adam Pulver for the family plaintiff appellees. The question in this case is not whether Tyson's Waterloo facility was engaged in important work that was critical or vital to the continued functioning of America. We can assume that like grocery stores, healthcare workers, transit operators, it was, nor is the question whether it acted reasonably in light of changing, shifting circumstances in light of the pandemic. That's a merits question that will, that even in state court, Tyson will be able to address whether it acted reasonably in light of what was going on in society. The question is whether it was acting under the direction of a federal officer acting under the color of such office, which is the term used in the statute. And although we just heard some descriptions of actions that the government has been suggested to have taken, none of the evidence that Tyson actually submitted below consisted of an instruction to stay operational if at all possible. Nowhere in the record below is there any evidence, even a declaration from Tyson's own officials saying that that's what Tyson was directed to do. Indeed, that doesn't even appear in Tyson's briefs. Tyson says at one point it was directed to stay open. Well, we know that Tyson was not directed to stay open at all costs because it shut down one plant on April 6th and then it shut down another plant on April 22nd. And then it says at another point that it was directed to stay open and operate consistent with CDC OSHA guidance. But that guidance wasn't even issued until after the majority of the decedents here had died. So there's nothing in the record that actually shows what we just heard apparently suggested have happened. Mr. Pulver, should we take into consideration when trying to figure out what a directive actually is to a certain industry, do we take into consideration, I guess the reality that this was an unprecedented, well, unprecedented for a hundred years pandemic that really no one knew exactly what to do and everyone's just trying to figure it out? Does that shape how we define directive in this context? I don't believe it does, Your Honor. I think that a directive that is regulatory in nature as the federal government and state level governments did hundreds and thousands of, and perhaps there were more of them as a result of the pandemic, that doesn't change the nature of the relationship. The government regulated more. And I think there really isn't actually any evidence here that Tyson was regulated more as a result of COVID, but there certainly was more regulation. But as Watson itself says, a difference in degree, not of kind, is not enough to convert that regulated relationship into a relationship of delegation. And so again, I do think it may play a role going to the merits, right? Whether it was appropriate, whether Tyson reasonably acted, that's certainly relevant to the duty of care question and the negligence question, but it doesn't show that the statute somehow was amended as a result of the emergency. Notably, there's been a lot of emphasis on this declaration of a national emergency, but that actually doesn't do anything. There's an actual legal meaning to a declaration of a national emergency and under the National Emergencies Act, but none of it had anything to do with what happened here. Just the idea that there's a national emergency does not have some sort of legal significance that brings private industry under federal control, nor does the identification of an industry as critical infrastructure, which happened in 2013. The 16 industries that were deemed critical infrastructure in 2013 didn't all of a sudden come under federal officer control with the declaration of a national emergency. I think that would be very troubling if it had, but there's certainly no one in the federal government in the last administration or this administration has suggested as much. And I think it's telling that Tyson is attempting to brush aside the explicit repeated comments of the federal government in this time period where it said, actually, no, we're not directing you to do anything. We still expect you to follow state and local governments. And Tyson brushes it off, says, well, they weren't sure what they were doing. Well, it's clear what they weren't doing, which is saying they were not taking control over the industry. And if they were not taking control over the industry and they were not directing Tyson to do anything, then Tyson was not acting under the color of federal officer, acting under color of the federal officer's office. I think the case can be resolved by a comment, a concession that was just made that Tyson was not under a direct mandate to stay open. That ends the case. If Tyson was not under a direct mandate to do anything, then it was not under the direction of a federal officer. And so let's follow up on that. What if they had been under a federal directive to keep their line operating at normal speeds? And because of that, they were not able to socially distance their workers. Well, I think there are two points there. I think one, I think that certainly would be a direction, but I still don't think it would qualify as something more than regulatory because Tyson would still not have been performing a federal governmental task. However, that if there were some sort of conflict with a federal directive, just like with any other federal regulation, that might be a conflict preemption defense that could be raised in state court. And conflict preemption defenses are raised in state courts all the time. That does not give rise to federal court jurisdiction. And much of what has just been argued is, well, we would have federal conflict preemption defenses, but federal conflict preemption defenses are not enough to get you over this special federal officer jurisdiction, which is where it assumes not just the defense, but all these other things. The mere existence of a colorable federal defense is not enough. Certainly though, there is no directive here to operate their line speeds at a certain speed. There's just a general reference that we were encouraged to do something, but the federal government encourages private action all the time. Grants are given out all the time. And every time a grantee receives federal money to pursue a federal program, it doesn't become a federal officer. There has to be something about the relationship other than you've been encouraged to do something. The role of DHS here is also, I think, instructive. And I think it's just been mischaracterized a bit. First of all, DHS was not mentioned in the Bulgic Notice of Removal. So we believe that there's no basis to conclude that a federal officer or an agency not even mentioned in a Notice of Removal can be the basis for arguing against a remand. But Tyson reached out to DHS for help. The only communications between Tyson and DHS were Tyson saying, hey, we'd like to get some extra masks. Who do I talk to at DHS that might be able to kind of grease the wheels? That's the kind of ordinary relationship that maybe it's not about masks, but that kind of email from a regulated industry or even a non-regulated industry to federal agency officials, those are sent all the time. And the fact that it was sent here from Tyson to the federal agent is not saying that Tyson was subservient to the federal agent. The question is whether it has been a delegation from the agent to the private entity, not vice versa. Briefly, I just wanna touch on the Defense Production Act. I think that there is no colorful argument that Defense Production Act was triggered here as to Tyson. It is a very specific statute. It says you do specific things, you prioritize federal contracts over others. No one here has even suggested that that was deployed. And as the federal government can explain shortly, they certainly did not do so here. As to the FMIA, the reason why it's unprecedented, the argument that they're making is because no one has ever suggested that the FMIA preempts all tort law within four walls of a meatpacking facility. The same argument would exist that murder laws don't apply within a meatpacking facility because you're saying- It could be a fine line, particularly in the times of the pandemic. I mean, this case took me back to March and April of 2020 when we had so many questions about what was going on. And one could say there was a fine line between regulations that would ensure meat safety and regulation that would ensure worker safety. I think that might be a fine line, but I think the argument that Tyson is making is far broader. They are suggesting, and I think this is where the field's court was wrong yesterday, that the mere acknowledgement, the mere operation of anything that impacts the operation of a meatpacking facility is preempted. And that's just not what the case law is. And then briefly, because I want to leave time for Ms. Powell, of course, I think that it's important to realize that the affirmative encouragement and important things that are produced, for example, gasoline, the federal government in all times, if all the fossil fuel producers in America stopped producing, that would be bad for America, pandemic or not. But every circuit court to address the issue has held that fossil fuel producers and gasoline producers are not acting under federal officers by just by doing something that the government obviously appreciates. And here, the government may have appreciated and expressed support to Tyson for continuing to operate. It didn't actually in the evidence set here. It just said, we like things and producing is good and things should be safe. But it didn't extend direct and extensive control, which is what both Jacks and Watson require for there to be this kind of special relationship. And the uniqueness of the pandemic didn't change the requirements of 1442A1. The statute was not amended for this purpose. And the arguments about the unique situation are issues that go to the merits and state courts are perfectly capable of resolving this. And if you don't have any further questions, I will yield the rest of the time to Mrs. Powell. Thank you. I see no other questions. So, Ms. Powell. May it please the court, Lindsay Powell for the United States. As Mr. Pulver indicated, I think a number of statements were made during the opening presentation that effectively concede that Tyson was not acting under federal direction and control here. And what stood out to me most was the acknowledgement that this was really just encouragement to cooperate. That is not federal direction or control. There is no case that remotely suggests that encouragement to cooperate satisfies the standards of 1442. In urging otherwise, Tyson points only to SOFR, but that's an entirely different circumstance where you have a private chauffeur by trade who is hired to provide a very specific function for federal officers and drive them around. So there's some form of employment relationship there that's totally lacking here. There's no relationship other than the encouragement as Mr. Clement conceded. And no case stands in for that. In the briefing, a great deal is made of whether informality suffices to support an exercise of the Defense Production Act. And Tyson relies a lot on Eastern Airlines for that. But again, Eastern Airlines is not a removal case. So it really doesn't go to this question. But I think it does underscore one of the other core issues here, which is the lack of specificity in what we're talking about. So even if somehow encouragement could come close to being enough for direction and control, these cases all require that it be specific. And there in the informal exercise of DPA authority, it was incredibly specific as the DPA itself is, that what was happening there was the manufacturer already had a contract with the federal government to produce aircraft. And the informal exercise of Defense Production Act authority was the prioritization of that contract, which was done through sort of a sidebar of fairly coercive measures. And the court found that to be enough. And here there's, of course, no actual exercise, informal or otherwise, of DPA authority. There is no contract involved, no prioritization of that contract. Just none of the specific tools available to the government were used there, either prior to the April 28th executive order or in that order. All that order does is delegate authority to the Department of Agriculture to use the tools provided by the DPA as necessary, which the Department of Agriculture has not done, did not do in the May 5th letters. So even if those letters and executive order that postdate the relevant conduct here could be thought to be relevant, they simply don't do what Tyson says they do. I think another- So as of this date, the Department of Agriculture has taken no action under the authority granted them under the DPA by the president? That's correct, Your Honor. That's my understanding. And the other thing I wanted to highlight is that I think really Tyson's argument here distills to the fact that it was doing important things in a critical moment. And we don't dispute that. There was a lot that was happening and that was urgent early in the pandemic. The food supply is unquestionably important. But what the documents that Tyson points to underscore is that there are a great many things that are critically important to our communities and our functioning as a country. And those industries are outlined in the DHS document that was put forth shortly after the national emergency issue. There are more than 130 different critical infrastructure industries identified there. And the food supply industry is really not materially distinguishable for the purposes of this conversation from those other industries. So under Tyson's theory, if what we're looking to for federal direction and control is this type of encouragement found in the declaration of the national emergency of something as critical infrastructure, then not only can Tyson remove the federal court here, but so can every healthcare worker, every pharmacist, every farmer, every truck driver who transports important items, every power supply worker, information technology workers, auto repair workers, bank workers. I mean, the number of critical industries is significant. This is a complex society and we depend on a great many things. So the fact that Tyson was doing something that was admittedly important, that the government admittedly wanted it to continue doing, does not make its conduct federal even in the context of emergency and does not subject it to the type of federal direction or control that's been necessary in these cases. I think if you look at the cases, it really does underscore the type of specificity that's needed. So even in cases where there is a demonstrated relationship with the government, a contract or a lease, take for example, Washington versus Monsanto in the ninth circuit or Suncor Energy in the 10th, the courts in those cases, notwithstanding in Monsanto that there was a contract to provide the government with PCBs for defense production or in Suncor that Exxon had a federal lease for the production of very important oil and gas. And that contract and that lease specified certain things that needed to happen or not happen. Notwithstanding that, there was still found to be a lack of the type of federal direction and control necessary to support removal because it didn't say how the fuel would be extracted or how the PCBs would be manufactured. A relationship is not enough. And here we don't even have that. It's simply encouragement. Returning to a question that was raised earlier, it is notable here that the encouragement being provided was not exclusively federal. There's a phrase that Tyson is fond of citing where I believe it was the president notes that the food suppliers would be working hand in hand with the federal government to ensure food and essentials are constantly available. When quoted in full, what that sentence says is that food suppliers would be working hand in hand with the federal government as well as the state and local leaders to ensure the food supply. So this was really a group effort to do something very important. And that group effort did not change the fundamental relationship between the federal government and Tyson in the way that would be necessary to support removal here. There's no specific exercise of a federal authority whatsoever. There's no direction or control being asserted over Tyson. The fact that FSIS officials from USDA are always in meat processing facilities to provide inspection services, the fact that they remain there, that doesn't change it. That's just federal regulation akin to the type of the Supreme Court dismissed in Watson as not being sufficient to support it. And just to give a little context to that, this sort of extra activity around the food inspection officials that was happening at the time was to make sure adequate numbers to support continued production. There was no change in kind to the way food inspection was being done or it was being staffed or ramping up of activities. It was a hard time for everyone and maintaining appropriate levels of staffing took some doing. And so the documents that are cited to in the addendum here simply demonstrate that the government was taking appropriate measures to ensure staffing continuity so that if plants were open that they could have the food inspectors that they needed. That's simply federal regulation. It's not direction or control. So again, just going back to where I started, I think the concession that all we have here is encouragement and cooperation among the federal government, among food suppliers, among the states is dispositive. That concedes that there is not the type of federal direction or control that's needed in these cases. Very briefly on the colorability question, one thing I just want to flag about the FMIA and its scope is that federal law does speak to worker safety. There's an Occupational Safety and Health Act and it specifically does not preempt state law. So it would be a very unusual thing for a far more specific statute that's by its terms, it's the Supreme Court Constituent Harris, really only goes to food safety and the humane treatment of animals and has a savings clause that specifically does not preempt most laws of state laws of general application, including workplace safety regs. That's in footnote 10 of Harris. For this very specific provision about slaughterhouses that does not preempt state laws of general applicability to somehow preempt fairly broadly here as Tyson urges, workplace safety laws and slaughterhouses when the Occupational Safety and Health Act does not would be an extraordinary conclusion and it's simply not plausible to read the FMIA to do that. So for that reason, in addition, Tyson has no basis for removal here, but the court need not even reach that question because Tyson was not acting under the direction or control of the federal government during the relevant period. Thank you. Thank you, Ms. Powell. And rebuttal. For whatever you have on the clock. Yeah, it's four and a half minutes just for your reference. And just a few points in rebuttal, your honors. First of all, Judge Kelly, you asked how the pandemic should affect the analysis. Well, the way it affects the analysis is everything that followed with the pandemic, starting with the declaration of national emergency on March 13th. That is followed by a March 15th call initiated by DHS. So it's not like we were calling DHS and they were like not returning our phone calls. DHS initiated a call with leaders of industry, a critical infrastructure, including Tyson. They gave us that, reinforced the message we were under a special responsibility to stay open at the same time that other industries were. The government was perfectly happy for the workers to stay at home for those places to shutter. And then that was followed immediately by a series of exchanges with DHS as to how we could get the necessary PPE and other things in order to maintain our operations. The relationship with the food, the FSIS inspectors changes fundamentally as a result of this declaration, because now the agriculture department is scrambling. So they're not the holdup. They're not the bottleneck because there is this shared responsibility to keep the food supply going. And they don't want to be the holdup by not having the inspectors. And that really distinguishes this from I think virtually every other industry, that degree of cooperation and control that takes place as a result of this. So you can talk about other critical infrastructure all you want, but they don't have the same kind of relationship with the federal government. The federal government wasn't scrambling to get inspectors, so the federal government wouldn't be the ones that caused Tyson to have to shut down right after at the highest levels we're being told that we have a special responsibility to stay open. And of course, the other prongs of the test are also important for avoiding this argument that this is going to affect lots of other industries. There aren't a lot of analogs to the FMIA. So when you get to colorable federal defense, it's not at all clear that grocery store workers or even pharmaceutical industries are going to have the same kind of defense. But we have that defense. It's clearly colorable. Indeed, the judge in the Fields case found it meritorious. So I want to talk about this issue of a mandate. Is a mandate necessary? And the case law all supports the notion that a mandate is not necessary. The chauffeur in the going back in the prohibition era cases, there's nothing in the case that says that he was commandeered and mandated to be a chauffeur. As far as we know, he volunteered for it. And that's consistent with all that matters. What matters is not whether the federal government forced you to provide a service for the federal government. What matters is whether they asked you nicely, whether they mandated and then you do it. And then you are sued in state court for doing exactly what the federal government asked you to do. Those are the circumstances in which you get federal officer removal. All of the federal contractor cases where you get federal officer removal. There's no mandate there. I don't think Blue Cross Blue Shield was under a mandate to provide health insurance to the federal government in the Jacks case. But once they volunteered to do it and once they did what the federal government asked them to do and they were sued in state court, then they get to remove it to federal court. And that's the only fair result. The reason the Eastern Airlines cases. But in Jacks, I would like to go back to Jacks. In Jacks, the court said that the reason was because they were doing something that the federal government would ordinarily do. Right. Ordinarily, the federal government does not produce food for the food supply. Is that a distinction that has any meaning at all? I think it's a distinction that leads right to Judge Kelly's question, which is sure. Ordinarily, the federal government isn't in the business of providing food or taking over the food supply if necessary. But in a pandemic, when the grocery stores are empty and people are engaged in stockpiling and panic buying and hoarding, it is job one for the federal government to make sure there is food on the shelves and that people stop the panic buying. And the way the federal government did that was to assure the American people that there was going to be adequate food supply. And that's because they were telling Tyson, you have a special responsibility. Everybody else can close. We don't care if they shut down their operations, but you need to stay open and we need to tell the American people you're going to stay open because that's what's going to stop the panic buying. And if I could just finish with one thought, my friend on the other side said, well, a lot of this stuff might be relevant to the duty of care under the state court. But how does an Iowa jury take all of this into account? This is difficult. This is subtle. The government is engaged here in the kind of jawboning they were engaged in in the Eastern Airlines. They don't want to actually force us to do this. And Tyson, frankly, doesn't want to resist. I mean, we want to help, but if the government gets its way and all of a sudden there has to be a mandate, the next time there's a pandemic, we're going to have to go through the charade where we resist the government's importuning to help them with our special responsibility. We're going to say, no, make us do it, order us to do it. Otherwise, we're never going to be able to get our case in federal court. I don't think that's the incentive that the government really wants to create in the long run. And it's not something that's required by the case law. Thank you. Thank you to all counsel for your arguments here today. They've been helpful. And we thank you also for the briefing. We'll take the matter under advisement.